IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 2, 2021

IN RE ISABELLA M., ET AL.[1]

**Appeal from the Juvenile Court for Macon County**
**No. 2020-JV-69     Ken Witcher, Judge**

_____

**No. M2020-01616-COA-R3-PT**

_____

This action involves the termination of a mother's parental rights to her minor children. Following a bench trial, the trial court found that clear and convincing evidence existed to establish the following statutory grounds of termination: (1) substantial noncompliance with the permanency plan; (2) the persistence of conditions which led to removal; and (3) failure to manifest an ability and willingness to care for the children. The court also found that termination was in the best interest of the children. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which ANDY D. BENNETT, J. and J. STEVEN STAFFORD, P.J., W.S., joined.

Kara Bellar, Carthage, Tennessee, for the appellant, Brittany R.

Herbert H. Slatery, III, Attorney General & Reporter, and Kristen Kyle-Castelli, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

G. Scott Binkley, Westmoreland, Tennessee, guardian ad litem for the minor children.

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

**OPINION**

## I. BACKGROUND

Joseph M., Isabella M., and Wyatt M. (collectively "the Children") were born to Brittany R. ("Mother") and Jonathan M. ("Father") in June 2014, February 2017, and June 2019, respectively. The parents and the Children lived with the maternal grandmother, Angela J. ("Grandmother"), and Grandmother's husband ("Step-Grandfather"). In 2018, the Tennessee Department of Children's Services ("DCS") substantiated allegations of the sexual abuse of Joseph by his paternal uncle, Michael M. ("Uncle"). DCS prohibited contact between Uncle and Joseph. In 2019, DCS substantiated allegations of the physical abuse of Joseph by Grandmother. DCS has been providing services since that time.

The current custodial episode began on July 16, 2019, when the Children were removed based on allegations of drug exposure, nutritional neglect, and physical abuse. DCS alleged that Father and Uncle, who was still prohibited from contact with Joseph, shot fireworks at Joseph and Isabella, causing injury. DCS provided that neighbors further reported that the Children are often outside unsupervised, that the parents pushed the Children, that the Children often appear hungry and ask for food, that Joseph was seen eating wild mushrooms and rotten vegetables, and that Grandmother was selling drugs from the home. At the time of removal, DCS confirmed that Isabella and Joseph had visible burns and that the home did not contain adequate food for the Children. The parents stipulated the allegations of dependency and neglect contained in the petition, namely a lack of supervision, environmental issues, and improper guardianship due to ongoing concerns in the home. The Children were adjudicated as dependent and neglected and placed in a pre-adoptive foster home together.

Jessica Carter, the Children's family service worker, developed an initial permanency plan in August 2019 for Mother[2] with the following requirements: (1) refrain from using illegal drugs or non-prescribed medications; (2) submit to random drug screens; (3) complete an alcohol and drug assessment and follow all recommendations; (4) sign releases for DCS to monitor progress; (5) obtain a mental health assessment with a parenting component and follow all recommendations; (6) maintain safe and stable housing; (7) notify DCS if anyone moves in or out of the home; (8) obtain sufficient income, including public welfare benefits; (9) pay child support; (10) arrive sober and refrain from physical punishment during visitation; and (11) schedule visitation in advance. The permanency plan was amended in January 2020 to include the following recommendations from Mother's mental health assessment: attend individual counseling, parenting education, parenting counseling group, and home making services. Both plans required all individuals living in the home to submit to random drug screens and pill counts.

---

[2] Father voluntarily surrendered his parental rights and is not a party to this appeal.

The plans were ratified by the trial court. Mother signed a Criteria and Procedures of Termination of Parental Rights in March 2020.

On June 15, 2020, DCS filed a petition to terminate Mother's parental rights based upon the statutory grounds of (1) abandonment by failure to establish a suitable home; (2) substantial noncompliance with the permanency plans; (3) the persistence of conditions which led to removal; and (4) failure to manifest an ability and willingness to care for the Children. DCS later removed the statutory ground of abandonment.

The case proceeded to a hearing on September 21, 2020, at which several witnesses testified. John Crody, an expert in mental health counseling and diagnosis, testified that he assessed Mother, beginning on August 7, 2019. He created a comprehensive mental health profile, including a personality profile with an assessment of her parenting skills and her risk of future physical abuse of the Children.

Mr. Crody testified that following his assessment, he believed that Mother would need to show "considerable improvement and resolution of problems in therapy before she's eligible for reunification." He explained that the most "outstanding risk factor" was her child abuse potential score. He provided that this score measures risk of physical harm against a child in her care, with a cutoff score of 215. Her score was 286. He further opined that Mother presented with "impaired cognitive function." He stated that Mother's Intelligence Quotient score was calculated at 58, with a variance of 7 points higher or lower. Mother also exhibited a "high probability" of substance abuse dependence disorder. He suspected that Mother attended parenting classes while compromised by a substance; however, he conceded that her observed impairment could have been a result of her limited cognitive functioning and not an illegal substance. His overall diagnoses were as follows: disruptive mood dysregulation disorder, psychoactive, substance dependence, low cognitive functioning, and avoidant personality disorder. He stated that due to Mother's impairments, he approached therapy differently and made sure to provide simple, concise, and clear objectives that he reiterated and adjusted as needed.

Mr. Crody testified that he also provided mental health services to Mother after she completed the assessment. He stated that she participated in the treatment plan and that together they initially decided to address appropriate associations with people around her, parenting skills, anger management, and child protection. He explained that he had some concern with whether Mother could identify signs of potential abuse and protect the Children from further abuse and neglect. He was unable to adequately address the issue of child protection because Mother later expressed that she was too overwhelmed to address the issue in addition to her other obligations. He recalled that she participated in weekly parenting classes but that her attendance was "spotty." She also did not participate in the weekly parenting support group due to transportation issues. However, she showed improved participation following the filing of the termination petition.

- 3 -

Despite Mother's limitations, Mr. Crody agreed that Mother showed some improvement and a greater ability to manage her anger and to relate to the Children as a parent; however, he still could not recommend unsupervised visitation at the time of the hearing. He explained that Mother had not completed his recommendations from the initial evaluation and that she would need to complete another child abuse assessment before he could reconsider his recommendations. He estimated that Mother would need an additional one or two years to fully enable herself to parent without supervision. He opined that reunification in the absence of an appropriate support system would pose a risk of substantial harm to the Children's physical or psychological welfare. He provided that Mother could not parent the Children without a key support person in her life given her limited cognitive functioning.

Debbie Thomas testified that she facilitated Mother's alcohol and drug assessment in March 2020. She stated that Mother reported a history of prescription and non-prescription opiate use and a history of methamphetamine use. Mother admitted Oxycodone use for pain without a prescription three days prior to the assessment. Mother advised that she does not receive care from a doctor due to a lack of insurance. She further reported Oxycodone use from the age of 17 due to ongoing pain. Mother did not view her repeated use as an addiction and scored an 11 on Recognition, placing her in the lowest score range which indicated she had "no acknowledgement of having problems related to drug use and little desire for change." Based upon the overall results of the assessments, Ms. Thomas issued the following recommendations:

1. [Mother] is recommended to successfully complete Substance Abuse Intensive Outpatient Therapy (IOP) for her self-reported unprescribed Oxycodone use.
2. [Mother] is recommended to continue her Outpatient Therapy and to follow through with recommendations from this therapy to help develop adaptive coping skills.
3. [Mother] is recommended to attend parenting education to work on child supervision, coping skills and flexibility within the family dynamic.

She stated that Mother began Intensive Outpatient Therapy ("IOP") as requested in May 2020. She recalled that Mother signed into the virtual class but was often lying down and would not engage or participate in a meaningful manner. She stated that the program was six weeks, which would have allowed her to complete the program by the end of June or July 2020. Mother tested positive for opiates on May 29, 2020, which added an additional 12 sessions of IOP to her program. She acknowledged that Mother finally completed the program on September 7, 2020, approximately two and half months after the filing of the termination petition. Mother still lacked some ongoing requirements, namely regular attendance at Narcotics Anonymous and 10 weeks of aftercare. She stated that Mother exhibited a lack of willingness throughout the entirety of the program.

Ms. Thomas testified that she also provided child and family therapy services for Joseph as a result of behavioral issues at home and in school. She provided that he was ultimately diagnosed with trauma-related Attention Deficit Hyperactivity Disorder ("ADHD"). She could not recommend Joseph's placement with Mother as a result of her assessment and her ongoing work with him. She claimed that Joseph is thriving in his current environment now that he has consistency, security, and safety. She believed a change in caretakers would present an added trauma and would have a negative effect on his emotional and psychological welfare. She explained that Joseph disclosed a history of abuse and neglect of himself and the other children in the home, specifically Isabella.

Ms. Carter, the family services worker, testified she received the case in August 2019 and has worked with the family since that time. She confirmed that DCS has received several referrals concerning this family in the past and that the final referral involved, inter alia, physical abuse and drug exposure. She provided that Mother participated in the development of the permanency plans and that she worked with Mother to ensure she understood the requirements of the plans, despite her limited cognitive functioning. She agreed that Mother completed her alcohol and drug assessment and her mental health assessment. Mother did not follow the recommendations from the assessments and still lacks suitable housing. She explained that Mother still lives with Grandmother and Step-Grandfather, who are both known drug users and have refused involvement with DCS as evidenced by their shutting themselves in their room when she arrives at the home. Further, Grandmother's physical abuse of Joseph was substantiated. She advised Mother that the home would not be suitable for the Children. She was further concerned that others were also living in the home that were not approved by DCS, namely a man who came out of a back bedroom and failed to identify himself.

Ms. Carter asserted that Mother showed an initial willingness to complete the requirements of the permanency plan but that her enthusiasm has since "tapered off." She stated that Mother appeared at her last hair follicle screen with recently dyed hair, despite having been advised to refrain from dying her hair prior to a screen. Mother tested positive on a urine screen for opiates on May 29 and July 1, 2020. Mother also refused help on a number of occasions and asserted that she would secure services herself. She agreed that Mother secured seasonal employment from November 2019 to January 2020. Mother has since secured new employment, beginning in July 2020, following the filing of the termination petition.

Relative to the Children, Ms. Carter testified that Mother attended visitation but generally focused on one child to the exclusion of the others. She provided that Mother was not ready to reunify with the Children. She explained that Mother has failed to fully address her drug use, still denies Joseph's claims of sexual abuse, and has failed to complete her parenting education courses, a necessary component due to her physical abuse of Joseph. She explained that Mother was observed smacking Joseph across the face prior to removal. She stated that the Children have remained in the same pre-adoptive home

since the time of removal, are receiving the services they need, and have shown improvement and a bond with the foster family.

Foster Mother testified that she observed concerning behaviors with Isabella and Joseph when they initially arrived at her home. She provided,

> Both children were cussing when they came in, they were hitting, kicking, biting. [Joseph] had pretty bad anger. He would throw things, he would throw his body in the floor, kicking, screaming, when he didn't get his way. They didn't seem to know right from wrong.

She asserted that Joseph was also caught stealing at school. She recalled that Joseph described instances of abuse and neglect while in Mother's care and that Joseph exhibited inappropriate sexual behaviors upon his arrival in the home. She asserted that Isabella expressed fear toward males in the home and took some time to establish a healthy bond with Foster Father and other males in the family.

Foster Mother expressed her love for the Children and her willingness to adopt should they become available for adoption. She provided that the Children were doing well and had bonded with her husband and a fourth child in the home.

Following the hearing, the trial court granted the termination petition on the three remaining grounds alleged by DCS. The court also found that termination was in the best interest of the Children. This timely appeal followed.

## II.    ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.    Whether clear and convincing evidence supports the trial court's finding of statutory grounds for termination.

B.    Whether clear and convincing evidence supports the trial court's finding that termination of Mother's parental rights was in the best interest of the Children.

## III.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests

protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination

proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "Thus, this court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359 at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV.    DISCUSSION

### A.

As indicated above, the court granted the termination petition based upon the following statutory grounds: (1) substantial noncompliance with the permanency plan; (2) the persistence of conditions which led to removal; and (3) failure to manifest an ability and willingness to care for the Child. We will discuss each ground in turn.

### 1.    Substantial noncompliance

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that

"[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *Id.* Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49. "Substantial" is defined as "of real worth and importance," Black's Law Dictionary (11th ed. 2019), and "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548.

This ground for termination does not require that DCS "expend reasonable efforts to assist a parent in complying with the permanency plan requirements." *In re Skylar P.*, No. E2016-02023-COA-R3-PT, 2017 WL 2684608, at *7 (Tenn. Ct. App. June 21, 2017); *see also In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) ("[I]n a termination proceeding, the extent of [the Department's] efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

We, like the trial court, hold that the requirements of the plan were reasonably related to the grounds for removal but that Mother has failed to substantially comply with said requirements. We acknowledge that Mother fulfilled some requirements, namely her completion of assessments and securing employment, albeit after the termination petition was filed. However, she failed to address the most important aspects of her plan, namely refraining from illegal drug use and following the recommendations from her assessments. Both Mr. Crody and Ms. Thomas provided that Mother had not fully followed the recommendations. Ms. Thomas further asserted that Mother exhibited a lack of willingness to address her drug abuse, while Mr. Crody stated that Mother only showed a greater sense of willingness once the termination petition had been filed. Mother further tested positive for opiates in May and July 2020, after she had completed her drug use assessment but while she was still in the program. She had also not secured a safe and stable home away from Grandmother, whose physical abuse of Joseph was substantiated. Accordingly, we conclude that there is clear and convincing evidence to support the trial court's

determination that Mother's parental rights should be terminated on the ground of substantial noncompliance with the permanency plan.

### 2. *Persistence of conditions which led to removal*

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i)      The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)      There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)      The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550. The statute does not require that only the original conditions leading to removal be used to establish grounds for termination. On the contrary, the statute specifically includes both "[t]he conditions that led to the child's removal . . . or other conditions [ ] that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(i).

The record reflects that the stipulated conditions which led to removal in this case persist, namely a lack of a safe and stable home and child safety concerns. Other conditions also exist that would cause the Child further neglect, including Mother's failure to remedy her illegal drug use as evidenced by her positive drug screens. Mr. Crody estimated that Mother needed an additional one or two years to ready herself for reunification. Likewise, Ms. Thomas provided that Mother had not yet completed her after care requirements and showed a lack of willingness and participation in the program itself. Following our review,

- 10 -

we conclude that there is little likelihood that the conditions which led to removal and other conditions now found will be remedied at an early date so that the Children can be safely returned in the near future and that the continuation of the relationship greatly diminishes the Children's chances of early integration into a safe, stable and permanent home. Accordingly, we also affirm the trial court on this ground of termination.

### 3. *Failure to manifest an ability and willingness to assume custody*

The trial court found that DCS had proven by clear and convincing evidence that Mother's parental rights should be terminated pursuant to Tennessee Code Annotated section 36-1-113(g)(14), which provides as follows:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, a petitioner must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Second, a petitioner must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

As to the first element, our Supreme Court instructed as follows:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citation omitted) (resolving the split in authority regarding whether parental rights can be terminated if a parent has manifested a willingness, but not an ability to personally assume legal and physical custody or financial responsibility for the child).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we

- 11 -

have explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732).

Mother did not testify at the hearing. The record reflects that Mother showed an overall lack of willingness to ready herself for the Children's return, with some improvement once the termination petition had been filed. She has further evidenced her inability to assume responsibility of them as evidenced by Mr. Crody's testimony. Specifically, Mother lacked an adequate support system to enable her to care for the Children without DCS involvement and would need additional time to ready herself for reunification. The record supports a finding that placing the Children with her would pose a risk of substantial harm to their welfare given her failure to adequately address her illegal drug use and her inability to provide a safe home free from a known abuser. We affirm the court's finding on this issue.

B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must consider whether termination was in the best interest of the Children. In making this determination, we are guided by the following non-exhaustive list of factors:

> (i)    In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

>> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

>> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies

- 12 -

for such duration of time that lasting adjustment does not reasonably appear possible;[3]

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see*

_____

[3] *In re Kaliyah S.*, 455 S.W.3d at 555 ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

*also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

Mother has failed to ready herself for the Children's return. Tenn. Code Ann. § 36-1-113(i)(1), (2). Meanwhile, the Children have found a family in their foster home with parents who wish to adopt them as their own. A change of caretakers at this point would be detrimental to their emotional condition. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain as to Mother's ability to provide a safe and stable home for the Children as evidenced by her failure to adequately address her illegal drug use, to secure a home free from a known abuser, and to improve her ability to identify signs of potential abuse. Tenn. Code Ann. § 36-1-113(i)(6), (7). Mother's mental and emotional state is also of concern given her listed diagnoses and Mr. Crody's estimation that Mother would need an additional one to two years to ready herself for parenting. Tenn. Code Ann. § 36-1-113(i)(8). With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Children. We affirm the trial court.

## V.     CONCLUSION

The judgment of the trial court is affirmed. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Brittany R.

_____
JOHN W. McCLARTY, JUDGE